# EXHIBIT

# 1

Dockets.Justia.com

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| TRACY K., and GALEN D. BARKER | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 1:07-CV-0294 |
| | § | |
| HALLIBURTON COMPANY d/b/a | § | |
| KBR KELLOGG BROWN & ROOT | § | |
| (KBR); KELLOGG BROWN & ROOT, | § | |
| SERVICES, INC.; KELLOGG | § | |
| BROWN & ROOT INTERNATIONAL, | § | |
| INC.; KELLOGG BROWN & ROOT, | § | |
| LLC; KELLOGG BROWN & ROOT, | § | |
| INC.; KELLOGG BROWN & ROOT, | § | |
| S. de R.L.; KELLOGG BROWN & | § | |
| ROOT (KBR), INC.; KBR | § | |
| TECHNICAL SERVICES, INC.; | § | |
| ALL MOKHTARE; SERVICE | § | |
| EMPLOYEES INTERNATIONAL, | § | |
| INC.; and THE UNITED STATES OF | § | |
| AMERICA | § | |
| §       Defendants. | § | |

## AFFIDAVIT

1.      My name is Dean Graves. I certify that I am competent to make this affidavit and have personal knowledge of the facts.

2.      I am Senior Counsel with KBR, Inc. ("KBR") and support KBR's Human Resources department. In my capacity as Senior Counsel, I am familiar with the corporate structure of KBR and its subsidiaries and affiliates and the products and services offered by those companies. I have also become familiar with certain background facts relating to the Barkers' Complaint in this case.

3.      KBR is an engineering and construction company. It is incorporated in Delaware and is headquartered in Houston, Texas. KBR was recently spun off from Halliburton Company, which is also incorporated in Delaware and headquartered in Houston, Texas.

4.      Kellogg Brown & Root Services, Inc. is incorporated in Delaware. Its primary place of business is Houston, Texas.

5.      Kellogg Brown & Root LLC is incorporated in Delaware.  Its primary place of business is Houston, Texas.

6.      Kellogg Brown & Root, S. de R.L. is incorporated in Panama.  Its primary place of business is Houston, Texas.

7.      KBR Technical Services, Inc. is incorporated in Delaware.  Its primary place of business is Houston, Texas.

8.      Kellogg Brown & Root, Inc. is no longer an active entity, as it was merged on December 31, 2005.  Kellogg Brown & Root LLC is successor to this entity's rights and interests.  It previously was incorporated in Delaware and based in Houston, Texas.

9.      KBR's business operations within the Eastern District are limited to one industrial jobsite employing approximately 57 persons.

10.     One of KBR's projects is called the Logistics Civil Augmentation Program, or "LOGCAP III."  The LOGCAP III project provides logistical support to the U.S. government abroad, including operations in Iraq.  Certain foreign subsidiaries of KBR employ persons to perform work on the LOGCAP project in performing under U.S. government contracts.  One of these foreign subsidiaries is SEII.  SEII is incorporated in the Cayman Islands and has its principal place of business in Dubai, United Arab Emirates.

11.     The residence and employment status of the individuals who are likely to be witnesses or whose depositions are sought by Plaintiffs in this case are as follows:

Persons Identified in Complaint
a)      Crystal Daniels, who was a Document Control Specialist, separated from employment on May 19, 2005.  Ms. Daniels' last known permanent residence was in Clarendon, Arkansas.

b)      Barron Marcee, who is a Deputy PSM Manager, is currently working in Iraq.  Mr. Marcee's last known permanent residence was in Missouri City, Texas (Houston area).

c)      Wesley Lane, who is a Senior HR Generalist, currently works for KBR in Houston, Texas.  Ms. Lane resides in Houston, Texas.

d)      Jeff Melton, who is a Project Lead, is currently working in Iraq.  Mr. Melton's last known permanent residence was in Houston, Texas.

e)      Sherman Richardson, who is a Billeting Coordinator, is currently working in Iraq.  Mr. Richardson's last known permanent residence was in Fort Worth, Texas.

f)      Robert Richmond, who was a Logistics Supervisor, separated from employment on November 11, 2006.  Mr. Richmond's last known permanent residence was in Cypress, Texas (Houston area).

Additional Persons Whose Depositions Plaintiffs Seek

g)    Edward Powell, who was a Senior Buyer, separated from employment on January 10, 2005. Mr. Powell's last known permanent residence was in Rockdale, Texas (within the Western District of Texas, Waco Division).

h)    Craig Grabein, who was a Project Lead, separated from employment on January 26, 2006. Mr. Grabein's last known permanent residence was in Spring, Texas (Houston area).

i)    David Ziemba, who was a Deputy PSM, separated from employment on July 10, 2006. Mr. Ziemba's last known permanent residence was in Niantic, Connecticut.

j)    Steve Gulyas, who was a PGM O & M, separated from employment on August 13, 2005. Mr. Gulyas' last known permanent residence was in Virginia Beach, Virginia.

k)    Kenya Thomas, who was a Buyer, separated from employment on February 18, 2006. Ms. Thomas' last known permanent residence was in Houston, Texas.

l)    Barbara Abbott, who is a Procurement Instructor, is currently working in Iraq. Ms. Abbott's last known permanent residence was in Goodview, Virginia.

m)    Steve Osgood, who was a HR supervisor, separated from employment on January 31, 2006. Mr. Osgood's last known permanent residence was in Sawyer, Oklahoma.

n)    Trae Miller, who is an HR manager, is currently working for KBR in Houston, Texas. Mr. Miller's last known permanent residence was in Houston, Texas.

o)    Bill Lloyd, who was a Senior Operations Coordinator, separated from employment on June 1, 2006. Mr. Lloyd's last known permanent residence was in Lakeville, Louisiana.

p)    Jerry McElveen, who is a paramedic, is currently working in Iraq. Mr. McElveen's last known permanent residence was in Leesville, Louisiana.

q)    Kara Hall, a Senior HR Generalist, is currently working in Iraq. Mr. Hall's last known permanent residence was in Missouri City, Texas (Houston area).

r)    Terrence Copling, an ER Manager, is currently working in Iraq. Mr. Copling's last known permanent residence was in Mesquite, Texas (within the Northern District of Texas, Dallas Division).

s)    Arnold Palmer, an ER Manager, is currently working in Iraq. Mr. Palmer's last known permanent residence was in Kingwood, Texas (Houston area).

t)    Toni Dimkovski, a Security Tech, separated from employment on April 2, 2006. Mr. Dimkovski's last known permanent residence was in Kumanovo, Macedonia.

3

u)      Chriselita Lopez, an Accountant, is currently working in Iraq. Ms. Lopez's last known permanent residence was in Houston.

v)      John Stewart, an HSO Security Manager, is currently working for KBR in Houston, Texas. Mr. Stewart lives in Houston.

w)      David O'Keefe, a Senior SCA, separated from employment on June 24, 2006. Mr. O'Keefe's last known permanent residence was in Louisville, Kentucky.

x)      Tony Vinson, a former project manager, separated from employment on September 21, 2006. Mr. Vinson's last known permanent residence was in Plano, Texas (within the Eastern District of Texas, Sherman Division).

y)      Cynthia Frank, a Senior SCA, is currently working in Iraq. Ms. Frank's last known permanent residence was in Baytown, Texas (within the Southern District of Texas, Houston Division).

z)      Clarence Noble, a former Labor General Foreman, separated from employment on July 2, 2006. Mr. Noble's last known permanent residence was in Bridgeport, Texas (within the Northern District of Texas, Fort Worth Division).

aa)      Bob Swisher, a former Senior SCA, separated from employment on December 13, 2004. Mr. Swisher's last known address is a P.O. Box.

bb)      Rosita McKenzie, an SCA, is currently working in Iraq. Ms. McKenzie's last known permanent residence was in Houston.

cc)      Darrell Kaiger, a Logistics Supervisor, is currently working in Diwaniyah. Mr. Kaiger's last known permanent residence was in Charlotte, North Carolina.

dd)      Duane Kizer, a former Construction Manager, separated from employment on March 15, 2007. Mr. Kizer's last known permanent residence was in Kingsville, Texas (within the Southern District of Texas, Corpus Christi Division).

ee)      Doug Bellah, a Procurement Manager, is currently working in Iraq. Mr. Bellah's last known permanent residence was in Spring, Texas (Houston area).

The above information regarding these persons' titles, locations, and permanent residences is based on personnel records of KBR or its subsidiaries.

6.      The residence and employment status of the following individuals identified by Plaintiffs in this case could not be determined from KBR personnel records:

a)      Holly Sacco
b)      Nicholas Aguilard

c) Crystal Martinez
d) Ali Mokhtare
e) Brian Hathaway
f) Lyn Falanga
g) Jennifer Valez
h) Adam Gabriel
i) August Finn

Dated this 7th day of _____, 2007, at Houston, Texas.

SUBSCRIBED AND SWORN TO BEFORE ME on June 7, 2007, to certify which witness my hand and official seal.

YOLANDA SOLORIO
Notary Public, State of Texas
Commission Expires 03-15-2009

Notary Public in and for the
State of T E X A S

6/7/2007
Date

Houston 3282286v.1

5

# EXHIBIT
# 2

# EMPLOYMENT AGREEMENT
### (Foreign Service – Single Status Assignment)
## US CITIZEN

**Employee: <u>Tracy K. Barker</u>**          Date: <u>July 21, 2004</u>

**Address** <u>160 SISLER ST Fort Bragg n.c. 28307.</u>

This Employment Agreement sets forth the terms and conditions of employment between you and **Service Employees International Inc.,** ("Employer") for your employment in support of the U.S. Army's Area of Operation under the U.S. Contract DAAA09-02-D0007. This Employment Agreement includes the Data Sheet that is attached. In the event of any conflict between these documents, the terms of the Employment Agreement will control.

## GENERAL TERMS AND CONDITIONS

1.   You agree to perform services of the job classification shown on the Data Sheet, and other services within your capability as requested by Employer. You may terminate your employment at any time, subject to loss of compensation, if any, as specified herein, and Employer may likewise terminate your employment at any time, for any reason, including for its sole convenience. Earned but unpaid compensation will be paid if Employer terminates your employment for its convenience or for any other reason.

2.   This Agreement and the attached Data Sheet show specific terms and conditions of your initial employment assignment, the identity of the corporation that will be your Employer, the position for which you are initially assigned/hired and location of the project, your rate of pay and other applicable benefit programs. In addition, you are responsible for compliance with the Halliburton Code of Business Conduct, Corporate Policies and Kellogg Brown & Root Business Practices.

3.     Except for insurance, Employer shall have no liability in damages whatsoever to you for injuries, disabilities, detention, death or other losses arising out of, or in connection with terrorism, war (declared or undeclared), rebellion, labor strike or unrest, civil strife or acts of the civil authority or armed forces of any nation; provided, however, in the event of capture, you will be paid in accordance with the Specific Terms and Conditions of Capture and Detention. In an emergency, Employer may, at its discretion, elect to evacuate you to some secure location. Your sole recourse for any injury, illness, or death arising out of or in the course of your employment under this Agreement shall be as determined under the provisions of the Defense Base Act.

4.   Your compensation is identified on the attached Data Sheet. Each pay period, you will be paid by applying the amount earned, after deducting mandatory tax withholdings, your authorized employee benefit charges, and any advances, reserves, or other obligations to Employer. Your pay will be sent to the location you designate on the check disposition form.

5.   Payments shall be made on a monthly basis. Wage payments shall be subject to deductions required by law, deductions provided for in this Agreement and such deductions as you from time to time may authorize in writing.

6.   Employer will pay your travel expenses from Houston, Texas or your designated Point of Origin to the Assignment Location and your return to your Point of Origin at the most economical and practical airfare available. No other relocation or repatriation expenses will be provided.   <u>Note</u>: In accordance with Federal Acquisition Regulation 52.247-63 -- Preference for U.S.-Flag Air Carriers, all flights must be on a U.S. Flag Air Carrier unless the exceptions identified in the regulation are met and properly documented.

7.   Since your employment is terminable at any time by either party, Employer assumes no responsibility for any loss related to your decision to dispose of real or personal property or to resign from other employment or business arrangements. Any such arrangements that you make are made at your risk, on your own best judgment.

8.   You understand and agree that the employment relationship is at will and that there is no guarantee of continued employment or any commitment on the part of Employer, either express or implied, to renew this

Employment Agreement for any additional term or period.

9.    Employer ceases to be liable for fulfillment of any and all obligations stated in this Agreement upon the termination of employment. However, upon termination Employer shall pay you all earned and unpaid Interim Leave benefits and demobilization travel back to your Point of Origin.  If you resign or are terminated for cause, you will forfeit any unpaid Interim Leave except where you were prohibited from taking Interim Leave by project management.  In such cases, you will be paid for your Interim Leave days only to which you are otherwise eligible and entitled.

10.    You agree to comply with all laws and regulations, both civil and U.S. military (to include U.S. Army Command Directives), applicable at the Assignment Location or the Job Site, and while on authorized travel status, and such other rules, regulations, and policies as the Employer may establish from time to time. You understand that the Job Site may be under the supervision of military authorities, and agree that compliance by Employer with any order, directive or regulation promulgated by military authorities, which results in a breach or default by Employer with the terms of this Agreement shall excuse Employer for any such breach or default.

## SPECIFIC TERMS AND CONDITIONS

1.    **Assignment Duration**

**The duration of your assignment is anticipated to be approximately 12 months.**  There is no minimum guaranteed duration of employment.  This Agreement shall remain in full force and effect for the duration of the assignment, including any extensions.

Your assignment will be in the U.S. Army's Central Command Area of Operation.  Your Assignment Location may be changed at any time within the Area of Operations, at the sole discretion of Employer.

You are aware that the Assignment Location may be a potentially hazardous environment.  Although the U.S. Government is responsible for providing security for Employer's operations, your acceptance of this assignment constitutes acceptance and acknowledgment of the risks and the willingness to stay in the Assignment Location until directed by the Employer to evacuate.

2.    **Compensation**

You will receive the compensation listed below, based upon your individual job classification.  In-Country Project Manager and the Project General Manager must approve any job classification or rate adjustment(s) in writing, and any changes in job classification or salary are only effective on the date indicated on the formal Personnel Action Notice (PAN).  No rate increase will be awarded unless there is adequate justification to support it.

**Base Salary:  $2,583.00** per month.

You will be paid a Base Monthly Salary as specified above on the basis of a minimum 40-hour workweek. There is no guarantee of more than 40 hours of work per week.  Foreign Service Bonus, Work Area Differential and Hazard Pay, if appropriate, apply only to the first 40 hours worked each week. All hours worked over 40 hours per week will be paid at the straight time rate.  The payroll period is monthly, with the pay ending date on Saturday of each pay period.  All rate adjustments will be effective at the beginning of a pay week.  For purposes of calculating the hourly rate for straight time pay, the following formula is used:

$$\frac{\text{Base Salary per month x 12 months}}{2080 \text{ hours}} = \frac{\text{Straight Time}}{\text{Rate per Hour}}$$

If you are placed on a standby status, while on standby status, you will be paid Base Salary on the basis of 8 hours per day, not to exceed 40 hours per week standby pay.  Foreign Service Bonus continues to apply during the standby period while In Country.  If you are placed on standby status while physically located in a work location which has an identified Work Area Differential and/or Hazard Pay, the Work Area Differential and/or Hazard Pay will also apply during the standby period.

(a)    Capture and Detention

In the event you are taken and held prisoner, hostage or otherwise detained by a hostile force or the force of any power not allied with the United States while on foreign assignment, Employer will continue to pay your Base Salary at the straight time rate per hour being paid on the date of capture and/or detention.  The number of hours per day you will be paid will be the average number of hours worked per day over the past two months immediately preceding detention.  Foreign Service Bonus and Work Area Differential uplifts that you are eligible for immediately preceding detention will continue for the duration of detention during the first 40

hours of each workweek. You will also be paid Hazard Pay for the first 40 hours of each week for the duration of your detention, regardless of whether you were receiving a Hazard Pay differential immediately preceding detention. Compensation benefits will continue for the period of detention or internment and will be paid to your authorized party. Additionally, Employer is authorized to continue to process your contribution for insurance as established by you prior to the period of detention or internment. Such contribution will be deducted from your compensation benefits prior to payment of the compensation benefits to your authorized party. This will ensure insurance coverage remains in full force and effect throughout the period of your detention or internment.

**(b)    Foreign Service Bonus**

A Foreign Service Bonus is provided as a financial incentive for you to accept a foreign assignment and to encourage you to remain at the foreign location. Accrual of the Foreign Service Bonus starts upon the date of actual departure from the Point of Origin for the Assignment Location and ends on the date of return to the Point of Origin. The Foreign Service Bonus applies to Base Salary only, and excludes any overtime or extended work week allowance and will be paid each pay period. Foreign Service Bonus is 5% of Base Salary, unless otherwise amended in writing.

**(c)    Work Area Differential**

A Work Area Differential recognizes work area hardship, weather extremes, or severe cultural or sociological differences. The Work Area Differential starts upon mobilization to the Assignment Location and ends on the last day at the Assignment Location. The Work Area Differential is applied to Base Salary only and will be paid each pay period. The Work Area Differential at the Assignment Location may be reviewed and adjusted at any time by Employer, without notice or a specific amendment to this Employment Agreement. The Work Area Differential in effect at the Date of Hire is identified in the Data Sheet.

**(d)    Foreign Tax/Social Insurance Protection**

Foreign Tax/Social Insurance Protection approximates the additional cost incurred by you due to your assignment in a foreign country.

It is currently anticipated that the Client will obtain an exemption or waiver of foreign taxes and social insurance obligations on your behalf. Consequently, no adjustment has been included in the Work Area Differential for these potential obligations. Should the Client fail to achieve the exemption or waiver, Employer will pay the foreign taxes and/or other host country statutory obligations on your behalf and seek reimbursement from the U.S. Government in accordance with Federal Acquisition Regulation 31.205-6(e). You will be responsible for completing and/or signing all necessary paperwork associated with the foreign taxes and/or other host country statutory obligations.

**(e)    Hazard Pay**

Hazard Pay, if and when authorized by the Federal Government, is based on Assignment Location. If applicable, Hazard Pay applies to Base Salary only. Hazard Pay may be reviewed and adjusted at any time by Employer, without notice or a specific amendment to this Employment Agreement. The Hazard Pay in effect at the Date of Hire is identified in the Data Sheet.

**3.    Taxes**

You will be personally responsible for compliance with applicable home country tax laws and regulations, including but not limited to, the payment of income taxes and FICA.

**4.    Sick Leave**

You will accrue 8 hours of sick leave for each full month of service, beginning with the completion of the first full month of your Foreign Service employment. Sick leave will not be paid in advance of it being earned. Partial months will not be prorated. The maximum allowable accumulation is 96 hours within any 12-month period. Approval of sick leave requires documentation from a certified medical professional. Sick leave benefits will be paid at 8 hours straight time per day. No payment will be made for unused sick leave, nor may sick leave accruals be used retroactively. Sick Leave is only applicable when you are In Theater and may not be combined with Interim Leave and/or Leave With Out Pay (LWOP) when the LWOP is taken away from the Work Assignment location.

**5.    Holidays**

You will be paid 8 hours straight time for any authorized holidays observed and not worked. Any approved project holidays that are worked will be paid at straight time. You must be in Country at your Assignment

Location to observe the holiday. Because of operational requirements to provide continued support to the Client, it may not be feasible for all employees to observe local holidays concurrently; therefore, holidays may be taken two weeks on either side of the actual day, or longer with In-Country Project Manager or Project General Manager written approval. Holidays cannot be combined with Interim Leave, however, with advance In Theater Country/Region Management approval, if you are In Country at your Assignment Location to observe a holiday, you may combine the holiday with Leave Without Pay following the holiday. (In other words, you wake up in Country on your holiday, but travel later that day and go on leave without pay as authorized in advance by the In Theater Country Manager).

6.     **Mobilization and Demobilization**

You will be mobilized and demobilized from and to your Point of Origin. You will be paid for mobilization travel time not to exceed two 8-hour days at Base Salary plus Foreign Service Bonus, Work Area Differential. During demobilization, you will be paid travel time not to exceed two 8-hour days at Base Salary plus Foreign Service Bonus. In accordance with Federal Acquisition Regulation 52.247-63 -- Preference for U.S.-Flag Air Carriers, all flights must be on a U.S. Flag Air Carrier unless the exceptions identified in the regulation are met and properly documented.

7.     **Local Housing and Transportation**

You will be furnished transportation and housing at the Assignment Location. Meals will be provided. Where meals (e.g. Dining Facilities, MREs, Meal Plan, etc.) are not provided, a Company Approved Per Diem (CAPD) may be authorized in lieu of reimbursement for actual expenses at the sole discretion of Employer. Laundry Services will also be provided.

8.     **Travel Expenses**

(a)  Point of Origin

Your established Point of Origin will be the closest major commercial airport facility to the address listed on the first page of this Agreement. This is the location from and to which your travel and other expenses provided by Employer will be payable. Point of Origin may not change during the term of employment under this Agreement.

(b)  Airfare Expenses

Your airfare expenses from the Point of Origin to the Assignment Location and return will be paid by Employer on an economy fare basis. In accordance with Federal Acquisition Regulation 52.247-63 -- Preference for U.S.-Flag Air Carriers, all flights must be on a U.S. Flag Air Carrier unless the exceptions identified in the regulation are met and properly documented.

(c)  Other Expenses

Travel expenses other than air transportation will be reviewed on a case by case basis by the Project Manager. Shipment of excess baggage of personal items is a personal expense and will not be reimbursed.

9.     **Interim Leave (Also referred to as R&R)**

Interim Leave is time away from the project during the assignment period due to hardships, lack of amenities and cultural disorientation in the Assignment Location. Interim Leave is expected to be taken but is subject to project schedules and requires approval from your supervisor and the In-Country Project Manager. Interim Leave will not be approved unless the job assignment is expected to last for a period of at least 30 days beyond the qualification date.

The following Interim Leave schedule will apply:

Upon completion of 120 days of assignment: A 10-consecutive-day leave.
Upon the completion of 240 days of assignment:
A 10-consecutive-day leave.
Upon completion of 365 days of assignment: A 10-consecutive-day leave. Labor:

R&Rs will be every 4 months for a total of three R&Rs per year. All R&Rs will be paid a total of 80 hours at straight time (no uplifts) over a minimum of 10 days leave. The R&Rs will not be accrued; therefore, they will either be observed or forfeited. Employees on the OAS, KBR 1917, and SEII payroll will not be eligible for vacation or Top-flex accrual while on overseas LOGCAP assignments.

Airfare:

In accordance with Project Policies, Employer will pay your airfare expenses for a scheduled Interim Leave or Business Travel.

For R&Rs 1 and 2 (4 and 8 months), KBR will pay up to a fixed amount for airfare. For airfare over the fixed amount, the delta will be payroll deducted from the employee. For tickets under the fixed amount, the employee will not receive the difference, but the client will achieve cost avoidance.

The reimbursement of UP TO the fixed amount is considered personal compensation as defined by FAR 31.205-6 and will be reported as taxable income. Therefore, the requirement to fly on U.S. Flag carriers is not applicable to an employee who receives UP TO $860 toward their airfare. An employee authorized in writing to receive UP TO the fixed amount of airfare reimbursement (approved Interim Leave Request) may make whatever travel arrangements he/she chooses since he/she is paying for the travel from his/her personal income. *Note: In order to be reimbursed UP TO the fixed amount, the employee must submit proof of travel (e.g., copy of ticket or itinerary) and proof of payment for that travel.*

For the third R&R (12 months), if the employee has not extended his/her employment for another year, the Company will send the employee to his/her point of origin, utilizing the return portion of the mobilization ticket if it is still valid. Due to time constraints and airline schedule changes, the return portion of the ticket may not be valid or may not be the most economical means of returning the employee to his/her Point of Origin. In that case, the Company will provide a return ticket to the employee's Point of Origin because that trip will also be considered demobilization of the employee. **IF**, however, the employee has been offered and has accepted the opportunity to extend his/her work assignment for another year, then the employee may elect to go to other than his/her point of origin OR receive reimbursement up to the amount of the most economical airfare to the Point of Origin or to the preferred destination, *which ever is less*.

In accordance with Federal Acquisition Regulation 52.247-63 -- Preference for U.S.-Flag Air Carriers, all flights must be on a U.S. Flag Air Carrier unless the exceptions identified in the regulation are met and properly documented.

Where the employee is required to change employee's scheduled R&R due to circumstances stemming from U.S. Government actions and/or actions beyond the control of the U.S. Government (e.g. Military Flight schedule changes or restrictions, lack of government provided force protection delaying convoy travel, civil unrest or terrorist activity prohibiting travel, critical unforeseen mission support requirements, etc), AND the Employer's Human Resources Department purchased the R&R ticket on behalf of the employee, Employer shall pay for the costs associated with the change in ticket fares, to include cost of fees for the changed schedule that resulted from the type of activities described above. In order to be reimbursed for the changed fare and associated change fees, the ticket must have been purchased by the Employer, the change in the tickets and associated fees must be processed through the Employer and the reason for the change must be fully explained and approved by the Regional Project Manager (or Country Manager if the site location is not part of a Region). E-mail approval will suffice.

The purpose of Interim leave is to provide rest and relaxation (R&R) from the work environment, thus maintaining operational effectiveness and optimum performance; therefore, you are expected to adhere to the Interim Leave Schedule.

If you voluntarily decline to take Interim Leave before your next scheduled Interim Leave, your Interim Leave is forfeited. You may not save Interim Leave to use in conjunction with another Interim Leave.

Where Interim Leave cannot be taken as a result of a management decision to cover operational requirements, when you become eligible for your next Interim Leave, you will be paid for the untaken Interim Leave. On an exceptional basis, Interim Leave that is postponed due to operational requirements may be taken at a later time with the express written approval of the In Country Manager.

Interim Leave may NOT be taken in a location where KBR personnel are eligible to draw Hazard Pay EXCEPT where the employee's POINT OF ORIGIN is in that same Hazard Zone and then only those personnel whose Point of Origin is in that Hazard Zone are authorized to go to their point of origin. They cannot go to another location that receives hazard pay. (e.g. an employee with a Point of Origin in Bosnia can go to Bosnia on Interim Leave, but that employee CANNOT go to Kosovo on Interim Leave).

If granted, Interim Leave starts the date you depart the Assignment Location and includes travel time from and return to the Assignment Location. Transportation will be provided to and from a designated leave departure point within the Assignment Location. You will not be

paid for unused Interim Leave. Payment for Interim Leave will only be made for days actually taken; therefore payment will occur only after the Interim Leave is completed.

While you are on approved Business Travel, Foreign Service Bonus and Work Area Differential if applicable will continue to apply to your Base Salary. Hazard Pay will only be paid when you are physically working in an area eligible to receive Hazard Pay.

If you are required to travel to another location on business, uplifts, to include Hazard Pay if applicable, for that location will be paid during the first 40 hours of the workweek.

Standby time associated with an Interim Leave is allowed only at the approved point of departure and only if the approved departure point is distant an/or difficult to reach due to weather conditions or other unforeseen circumstances (e.g. MILAIR flight availability). Standby time must be authorized by the In-Country Project Manager and must not exceed 8 hours per day. If you are required to travel to another location on business, you will be paid for all hours worked at the standby location.

Employer will pay your airfare expenses for scheduled Business Travel. All Business Travel must be coordinated and paid for by the local Human Resources Department. Exceptions for payment of Business Travel by other than the local Human Resources Department require written approval.

## 10.    Emergency Leave

Emergency leave may be granted in the event of a serious health condition or death in your immediate family or your spouse's immediate family. For purposes of emergency leave, immediate family is defined as spouse, child, parent, grandparent, brother or sister (Family members identified herein can include step relations).

Emergency leave must be authorized by the In-Country Project Manager, whose Human Resources Manager will coordinate such leave arrangements. The maximum you will be paid during any period of approved emergency leave is 40 hours straight time at the Base Salary rate only. The In-Country Project Manager may authorize additional leave days without pay, not to exceed 30 days.

In the event of an emergency, your family members should notify the nearest Red Cross agency, and request the Red Cross agency to notify the Kellogg Brown & Root office in Houston who, in turn, will notify the In-Country Human Resources Manager.

Employer will provide you with a roundtrip airline ticket to the commercial airport closest to the point of the emergency or Point of Origin. In accordance with Federal Acquisition Regulation 52.247-63 -- Preference for U.S.-Flag Air Carriers, all flights must be on a U.S. Flag Air Carrier unless the exceptions identified in the regulation are met and properly documented.

Proper documentation of the emergency, such as a copy of a death certificate or a physician's statement, is required for reimbursement of authorized travel expenses and emergency leave with pay. In the case of a death, a copy of the published obituary in a newspaper will suffice as initial proof of the death provided a death certificate is submitted to the Human Resources Department within the next 30 days.

## 11.    Leave Without Pay

The In-Country Project Manager may approve leave without pay in the event of a non-life-threatening situation involving a family member or for other personal reasons requiring your absence from the Assignment Location for a limited period of time, not to exceed 30 days. All expenses will be at your cost. You will be paid only for actual hours worked on day of your departure and day of return to the Assignment Location.

Leave Without Pay may NOT be taken in a location where KBR personnel are eligible to draw Hazard Pay EXCEPT where the employee's POINT OF ORIGIN is in that same Hazard Zone and then only those personnel whose Point of Origin is in that Hazard Zone are authorized to go to their point of origin. They cannot go to another location that receives hazard pay. (e.g. an employee with a Point of Origin in Bosnia can go to Bosnia on Interim Leave, but that employee CANNOT go to Kosovo on Interim Leave).

## 12.    Physical Examination

You represent that you are physically capable of performing the work for which you are employed at the Assignment Location.

During the term of employment, you agree, when and if required by Employer, to submit to a physical

examination by a representative designated by Employer and at Employer's expense. At Employer's direction, you agree to submit to a post assignment physical at the completion of your assignment. The physical examination may include a substance abuse test. You expressly authorize the examining representative to furnish those findings to Employer.

Your employment is contingent upon your passing the pre-deployment physical, and health examinations (including, but not limited to, tests for controlled substances), and obtaining immunizations required by Employer. In the event any such physical examination causes Employer to determine, in good faith, that you are not able to satisfactorily perform the job for which you are hired or that medical facilities at the Assignment Location are inadequate to provide you with the necessary level of care, Employer may, at its option, terminate this Agreement.

During the assignment period, you agree to cooperate in random or post-accident substance abuse testing and/or other testing for drugs or alcohol as requested by Employer.

You agree to submit to such vaccinations and immunizations as may be required by Employer, to be administered at such time, places and by such qualified medical practitioners as determined by Employer.

## 13.    Sickness, Injury, or Accident

Should your health become impaired by reason of injuries or illness, through no fault of yours, and it results in your termination of employment, you will be returned to the Point of Origin at Employer's expense. In accordance with Federal Acquisition Regulation 52.247-63 -- Preference for U.S.-Flag Air Carriers, all flights must be on a U.S. Flag Air Carrier unless the exceptions identified in the regulation are met and properly documented.

In that event, all further obligations of Employer shall cease, except with respect to the payment of insurance, if applicable, and any earned but unpaid compensation and Interim Leave.

Should you become impaired as the result of injuries or illness resulting, in whole or in part, from your negligence, Employer may terminate your employment for cause.

During the term of employment, you will be entitled to medical care at U.S. medical treatment facilities at the Assignment Location or elsewhere within the Area of Operations as authorized by the U.S. Army's Central Command.

## 14.    Employee Inventions

Patent Rights, Inventions, Modifications, Improvements

(a)    You agree to assign to Employer or its designees the following:

(i)    Title to all inventions, developments or improvements, whether patentable or not, made, developed or conceived or first actually reduced to practice by you, alone or jointly with others, in the scope of your employment;

(ii)    The right to file and prosecute patent applications on such inventions, developments or improvements in any and all countries; and

(iii)    The patent applications filed and patents issuing thereon.

(b)    You agree to disclose promptly and fully all such inventions to Employer and to assist Employer in every proper way (entirely at its own expense) to obtain and protect, patents thereon in any or all countries. Such inventions shall be the property of Employer whether patented or not.

(c)    You agree to cooperate and give full and complete assistance to enable Employer to perfect any patent under conditions set forth herein, including the execution of such papers or documents which Employer or those deriving rights therefrom, may reasonably require.

(d)    You represent that the inventions, if any, described in the accompanying papers comprise all the unpatented inventions, developments or improvements which were made or conceived of prior to your Date of Hire. You must list all such items which you wish to be excluded from these provisions:

(i)    Number of inventions, developments or improvements to be excluded **NONE** (If there are no unpatented inventions, developments or improvements write "none.")

(ii)    Number of pages of description and drawings and/or reproductions attached NONE (Description of invention(s) shall include title, purpose of invention, mode of operation, drawings, if any, and/or such other information as may be necessary to identify the excluded invention, developments, or improvements.)

<u>Copyrights</u>

In consideration of employment with Employer, you agree to provide a royalty-free, non-exclusive and irrevocable license to sell, reproduce, translate, publish, use and dispose of all copyrighted or copyrightable material produced or composed during your term of employment, conceived by you, alone or jointly with others, which was produced or originated:

(a)    At the specific request of Employer;

(b)    As a result of your employment and/or duties;

(c)    With use of time and material furnished by Employer.

15. <u>**Special Obligations of Employee**</u>

(a)    <u>Security</u>

You must comply with all security requirements of Employer and the U.S. Government. If U.S. Government or other personnel provide you access to any classified or sensitive information in error, you will report such occurrence to the In Country Security Manager immediately and cooperate in any investigation arising out of such occurrence. You must keep confidential all information, materials, documents and data furnished by Employer or U.S. Government.

(b)    <u>Searches and Inspections</u>

Employer reserves the right, with or without notice, to conduct searches or inspections of your personal belongings, living quarters, vehicle(s) or work area.

(c)    <u>Responsibility for Property</u>

Employer assumes no responsibility for loss of or damage to your personal belongings.

(d)    <u>Direct Deposit</u>

As a condition of employment, you agree to establish and maintain an automated direct deposit capability with a banking institution for direct deposit of monies earned.

(e)    <u>Data and Documents</u>

You agree to furnish any data and documents required by Employer for purposes of verification of statistics, national security, health, immigration or otherwise necessary or convenient with respect to any matter connected with your employment.

16. <u>**Standards of Conduct**</u>

You must observe the standards of conduct and other requirements of the Halliburton Code of Business Conduct in effect at your Date of Hire and as updated periodically, whether or not the law also imposes these standards and requirements.

In addition, the following standards for personal conduct are conditions of employment. Employer also requires compliance with regulations placed upon it from time to time by the U.S. Government, foreign government, and State and Local authorities. Accordingly, Employer may amend these standards of conduct, or may establish additional standards of conduct in the future. You are also required to comply with all Corporate Policies including all Project or Work Location Policies.

Actions that may require discipline or discharge include, but are not limited to, the following:

(a)    <u>Insubordination</u>

Failure or unreasonable delays in carrying out instructions given by superiors or managers; disrespect for those persons in positions of authority.

(b)    <u>Misconduct</u>

Fighting, threatening or inflicting bodily harm on another person; gambling; committing immoral acts or using abusive language; displaying or distributing lewd or obscene pictures or other materials, viewing, downloading or distributing pornographic material from the Internet, unauthorized possession or movement of Employer or Client property; engaging in any activity which conflicts with the interest of Employer or Client or in a manner which brings discredit or embarrassment on the Employer or Client.

**(c)    Violations Involving Alcohol or Controlled Substances**

Unauthorized possession or use, or being under the influence of a controlled substance (including narcotics and marijuana) while on duty or while on Employer or Client premises at any time; consumption or unauthorized possession of alcohol while on duty or on the work site, or having a detectable level of controlled substances, including alcohol, in the body while on duty or at the work site; refusing to submit to a drug or alcohol test if requested to do so; being at work under the influence of alcohol, resulting in the inability to perform work in a safe, productive, or professional manner; being in a physical condition which creates a risk of impairment to your professional judgment or to the safety and well being of yourself or others, to the Client, or to Employer or Client property; being drunk or under the influence of alcohol and/or drugs and behaving in such a manner off the job where Employer's reputation could be damaged.

Alcoholic beverages may never be kept or consumed on any military camp or facility unless authorized in writing by the senior military commander.

**(d)    Theft or Pilfering**

Taking, possessing or tampering with Employer or Client property or records without proper authority.

**(e)    Fraud, Dishonesty, or Abuse of Employer Policies**

Misuse or abuse of Employer policies such as excused absences, leaves of absence or sick leave; falsification of time card or Employer expense report, failing to give complete or accurate information for personnel and/or security records; intentionally making false statements, either oral or written, about yourself, Employer, Client, other employees, supervisors, or work situations; falsely claiming personal injury/illness as work-related in order to obtain worker's compensation or other employment benefits; misuse of Employer or Client-controlled funds.

**(f)    Misuse of Time**

Neglect of duty; failure to perform work at an acceptable standard; interfering with the work of other employees; sleeping or deliberate acts of inattention on duty; failure to return to duty promptly at the end of specified or established break periods; unauthorized sale of articles or services, unauthorized distribution or posting of literature, canvassing, polling or petitioning; conducting personal business on Employer time.

**(g)    Malicious of Negligent Destruction of Property**

Willful, malicious or negligent destruction of or damage to Employer or Client property, or destruction of or damage to property resulting from your failure to use proper procedures and/or equipment.

**(h)    Health/Safety Violations**

Failure to observe required health and safety practices and regulations; endangering the health and safety of yourself or other employees; committing unsafe acts such as loitering in or around aircraft/missiles or other heavy equipment during fueling or servicing; smoking in smoke restricted areas.

**(i)    Security Matters**

Loss or mishandling, deliberately or otherwise, of classified, proprietary or trade secret documents or confidential information; discussion of classified or sensitive matters with unauthorized persons or in public places; misuse of Employer or other official identification including automobile decals or Employee Identification badges; unauthorized possession and/or use of weapons, ammunition, explosives, unexploded ordinance/ residue; cameras or film; entering or assisting others to enter restricted or closed areas without proper authorization; denial, suspension or revocation of a security clearance; failure to report the occurrence of any unusual incidents which could adversely affect Employer or Client; wearing of Employer identification badges outside work locations requiring such identification, except while commuting directly between work locations or between residence and work locations; using the badge for reasons other than in connection with work assignment or as otherwise authorized by Employer; failure or refusal to comply with Security instruction/direction during Lockdown and/or security situation; failure or refusal to properly display employee identification and/or present identification upon request by an Employer or Client Security Guard and/or other Employer representatives acting in their official capacity.

**(j)    Absenteeism**

Unauthorized or excessive absence from the work assignment location, to include but not limited to, failure to return to work promptly at the scheduled conclusion of Interim Leave.

**(k)**    Tardiness

Excessive failure to be present at the scheduled report time for the start of a work shift or when work assignments are being issued.

**(l)**    Leaving Assigned Work Area

Leaving the assigned work area (except in cases of emergency) without prior supervisory approval.

**(m)**    Illegal Actions

Violation of a public law or regulation or commission of a criminal offense (to include Host Nation Laws), including, but not limited to, any violation committed while operating an Employer or Client motor vehicle while not possessing a valid operator's license; unauthorized operation of a Government or Contractor Acquired/Government Owned (CAGO) or Contractor leased vehicle for personal reasons; trafficking in narcotics, drugs, marijuana or other controlled substances; trafficking in black market goods, currency, and/or minors; payment or acceptance of gratuities, kick-backs or bribes.

**(n)**    Sexual Harassment

Sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature that is unwelcome or that creates an intimidating, hostile, or offensive work environment. Sexual harassment also occurs if submission to the conduct is either an explicit or implicit condition of employment or if submission to or rejection of the conduct is used as the basis for employment decisions.

**(o)**    Discrimination

Unlawful discrimination, harassment, or other disparaging activity, such as slurs or gestures, based on race, religion, age, sex, sexual orientation, national origin, disability or veteran's status.

**(p)**    Prohibited Personal Relationships

Being involved in a sexual or romantic relationship with another employee who is within the chain of command or sphere of influence or with an employee of a client, customer, subcontractor, or vendor when that employee has the capacity to directly influence the business relationship.

**(q)**    Other Violations

Any other acts or failure to act in a responsible, reasonable manner which reflects upon your fitness for the job and/or which adversely affects Employer's reputation or conflicts with the interests of Employer or Client, including such things as drinking intoxicants in public while wearing Employer provided or prescribed uniform; untidy or improper appearance; failure to wear Employer uniforms when required; involvement in preventable accidents involving Client or Employer owned or leased vehicles or equipment; failure to report an accident and/or damage to property or injury to other individuals; obstructing or delaying a properly authorized inquiry or investigation conducted by representatives of Employer or Client; or refusal to perform any and all requirements of the assigned job.

**17. Settlement of Personal Affairs**

Should you depart from the Assignment Location without settling your affairs, or should you become so physically or mentally disabled as to be incapable of handling your personal affairs, you hereby authorize Employer to settle your affairs to the extent Employer deems necessary and/or appropriate under the circumstances. You further authorize Employer to payroll deduct such expenses from any sums due.

In the event of your death while outside your country of citizenship during the term of this Agreement, Employer is authorized to make appropriate disposition of your body and personal effects in accordance with your wishes, or instructions from next of kin and/or family members. Costs associated with disposition and transportation of remains to point of interment will be borne by Employer. It is understood that Employer will make every reasonable effort to follow the wishes of your next of kin if possible.

**18. Assignment of This Agreement**

Employer may, in its sole and absolute discretion, assign all rights and obligations of Employer to any parent, subsidiary, affiliate or joint venture of Employer engaged in the same or similar work contemplated under this Agreement.

**19. Personal Baggage**

Your personal goods transported during travel are restricted to weight and size limitations as defined by the

authorized carrier. Unless authorized in writing by Employer, any additional charges for transport of your goods will be your responsibility. Employer assumes no responsibility for loss of or damage to your personal belongings. Where excess baggage is required to be transported by employee in connection with the assignment, Employer will pay excess baggage charges.

20. **Representations**

You represent that you have familiarized yourself with conditions existing at the Assignment Location, including those pertaining to health, economics, legal, political and religious condition, and that this Agreement is entered into with full knowledge of such conditions. You agree to become familiar with the rules, regulations, laws, policies, customs and traditions at the Assignment Location and acknowledge their applicability to your employment. Employer will, however, make available to you information it has available on living conditions and other matters of interest.

Employer undertakes no responsibility for providing housing, transportation or medical care to you other than as set forth herein.

You represent and warrant to Employer that: (a) all information provided by you with respect to your obtaining employment is true and accurate to the best of your knowledge; (b) you are fully qualified by virtue of your education and experience to perform all duties of your assignment; (c) you will perform such duties to the best of your ability; and (d) you have read this Agreement and agree to comply with all the provisions, terms and conditions contained herein. You further represent and warrant that neither the execution of this Agreement nor the performance of the services contemplated hereunder will violate the terms of any understanding, agreement or order between you and any other party or create or appear to create a conflict of interest between you and any other party.

You agree that unless you have prior written consent from Employer, you will not disclose or use at any time, either during or subsequent to your employment, any secret, proprietary or confidential information, whether patentable or not, of Employer or the Client, of which you become informed during employment, whether or not developed by you, except as required in your duties for Employer or the Client.

Upon termination of your employment, you agree to deliver promptly to Employer all company property

issued to perform work, all records, films, tapes, discs, drawings, blueprints, manuals, letters, notes, notebooks, documents, reports, electronic data and copies thereof, and all materials of a secret, confidential, proprietary or trade secret nature relating to Employer's business and which are in your possession or under your control. You agree to maintain the confidentiality of such materials thereafter.

21. **Employer Required Documents**

Before departure from your Point of Origin, you will, at Employer's expense, obtain necessary permits and clearances required for work in the Assignment Location. Fees for obtaining the necessary documents will be paid by Employer, or you will be reimbursed for these expenses upon presentation of written evidence of payment, as required by Employer. To the extent possible, Employer will assist you in obtaining the documents; however, it remains your sole responsibility to obtain the necessary documents.

22. **Qualifications, Reclassification**

You represent that you are technically and/or professionally qualified without further training or experience to perform the duties and responsibilities applicable to the work classification for which you have been employed as stated herein; that you have such licenses, certificates and credentials as are required or customary for performance of the job for which you are assigned/hired; and that you will accept work assignments at any location within the Area of Operations as may be assigned by Employer, at the hours and on such shifts as designated by Employer. In the event that Employer requires you to render services in a job classification other than that for which you were assigned/hired, you agree to perform such work in such classification to the best of your ability at the rate specified in this Agreement.

23. **Date of Hire**

The date of assignment/hire for purposes of this Agreement shall be the effective date of this Agreement. The effective date of this Agreement will be entered by the Human Resources Department and is the day you go "wheels up" en route to your first assignment in Theater. For purposes of calculating Interim Leave entitlements, the effective date of this Agreement is Day One.

24.  <u>Severability</u>

If any provision to this Agreement is determined to be invalid or unenforceable, it shall not affect the validity or enforceability of the other provision, which shall remain in full force and effect.

25.  <u>Governing Law</u>

This Agreement is formed in the State of Texas, and shall be governed by and construed in accordance with the laws of the State of Texas; except that with respect to all matters or disputes related to the validity or enforceability of provision 26 below, all issues shall be governed by and construed in accordance with the Federal Arbitration Act.

26.  <u>Claims/Disputes</u>

**In consideration of your employment, you agree that your assignment, job or compensation can be terminated with or without cause, with or without notice at any time at your option or at Employer's option. You also agree that you will be bound by and accept as a condition of your employment the terms of the Halliburton Dispute Resolution Program which are herein incorporated by reference. You understand that the Dispute Resolution Program requires, as its last step, that any and all claims that you might have against Employer related to your employment, including your termination, and any and all personal injury claim arising in the workplace, you have against other parent or affiliate of Employer, must be submitted to binding arbitration instead of to the court system.**

**It is expressly understood that, in the case of any controversy described above, all parent, subsidiary and affiliate or associated corporations of Employer, and of their officers, directors, employees, insurers and agents are third party beneficiaries to this provision and are entitled to invoke, enforce and participate in arbitration pursuant to this provision.**

**Should any party refuse to arbitrate or refuse to cooperate in arbitration, the remaining party or parties may proceed with arbitration in the absence of the party so refusing. Notices in respect to arbitration may be transmitted by any reasonable means calculated to convey actual knowledge of the unresolved matter or dispute. With respect to Employer and any affiliated companies, notice by**

registered mail shall be deemed reasonable and sufficient when mailed to:

**Dispute Resolution Program Administrator**
**Halliburton Company**
**4100 Clinton Drive**
**Houston, TX  77020-6299**

<span style="background:black;color:white">Employee's Initial</span>  _JB_

27. <u>Group Insurance and Other Benefits</u>

You acknowledge that you have been briefed and understand the available group insurance plans and the terms and conditions of other benefit programs available from the Employer.

You understand that if you are assigned to certain overseas projects, you may be required to enroll yourself and eligible family members in appropriate group insurance plans offered by Employer.

<span style="background:black;color:white">Employee's Initial</span>  _JB_

28. <u>Agreement and Release:</u>

You agree that any baggage or personal effects that are left on the premises or in the care and/or custody of Employer after your termination of employment shall be deemed abandoned after 30 days from the date of such termination, unless you specifically advise Employer to the contrary, in writing, within such period. Should you fail to remove personal property within 30 days of termination or within 30 days after giving such notice, you authorize Employer to sell the same as agent and remit the proceeds to the last known address, less the cost and/or expense incidental to the storage and sale.

<span style="background:black;color:white">Employee's Initial</span>  _JB_

29. <u>Termination</u>

If for any reason, your employment is terminated, you agree to complete the required out-processing procedure that includes the signing of exit documents and the return of all badges, vehicle stickers, employee identification cards, tools, books, supplies, money, and any other property issued to you.

<span style="background:black;color:white">Employee's Initial</span>  _JB_

30. **Conformance with Code of Business Conduct**

You specifically acknowledge and agree that you have been provided a copy of the Halliburton Code of Business Conduct, and that you are responsible for reading it in its entirety and complying with the provisions contained therein and any future updates to the Code of Business Conduct, available on the web at http://www.halliburton.com/about/business_conduct.jsp or you can contact your local Human Resources Department for a copy. Furthermore, you acknowledge that you have been specifically briefed and understand the Employer's policy on equal employment opportunity, including the prohibition against sexual harassment and discrimination or harassment based on race, sex or sexual orientation, national origin, age, disability or veteran status.



31. **Repayment**

You agree that you may be discharged without notice. You agree that if the cause for your discharge involves monetary or material loss to Employer, or the serious potential for such loss, Employer may withhold all compensation due you, to the fullest extent permitted by law, until restitution has been made.



32. **Modification in Writing**

No modifications to this Agreement are effective unless in writing, signed by you and the Project General Manager or his designee. This Agreement supersedes any and all prior understandings, promises, or agreements of any kind, whether oral or written, except special commitments and/or agreements approved by management as stated below.

33. **Special Provisions**

34. **Understanding of Terms**

You acknowledge that you have read this Employment Agreement, and fully understand, agree, and consent to the terms and conditions of this Agreement.

Executed at <u>Houston</u> this 21st day of <u>July</u> and effective as of_____ JUL 31 2004

**ACCEPTED**

████████: TRACY Kristina BARKER

████████████: 478 08 8212

████: 22 JUl 2004

Kellogg Brown & Root

By _Bea Ann Tolley_

Title    **HR Manager**
Date:    <u>July 21, 2004</u>

# Service Employees International, Inc.

## DATA SHEET

1. **Employer:** Service Employees International, Inc.

2. **Employee:** <u>Tracy K. Barker</u>

   _TRACY Kerstina BARKER_
   SS# _478 08 8212_
   _160 SISLeR_
   _Ft Benning N.c. 28307._

   Person to be notified in case of emergency:

   _GALEN BARKER_
   _Husband_
   _160 SISLeR ST_
   _Fort Bragg_
   _910-860-1077 N.C 28307_

   Effective Date: _JUL 31 2004_

   ACCEPTED

   Signature _Tracy K. Barker._

   Date _22 Jul 2004._

   Employer/Agent _Bea Ann Tolley_
   By: _____
       KBR Technical Services

   Date: <u>July 21, 2004</u>

3. **Location of Overseas Assignment:**
   U.S. Army's Central Command Area of Operations
   Currently anticipated to be: <u>Iraq / DIA/ISG</u>

4. **Status:** Single

5. **Job Classification:** <u>Administrative Associate</u>

6. **Assignment Duration:**

   The duration of your assignment is anticipated to be approximately twelve months. There is no minimum guaranteed duration of employment. You may terminate your employment at any time, subject to loss of compensation and incentives, if any, as specified herein, and Employer may likewise terminate your employment at any time, for any reason, including for its sole convenience.

7. **Compensation:**
   Foreign Service Bonus, Area Differential and Hazard Pay may change during the term of this Agreement. Changes to Base Salary will not be effective unless in writing and signed by the In Country Manager and Project General Manager.

   a. Base Salary: <u>$2,583.00</u>
   b. Payroll period: MONTHLY
   c. Overtime basis: <u>Straight</u>
   d. **Foreign Service Bonus:** 5%

   e. **Area Differential:** 25%

   f. **Danger Pay:** 25%

   g. Housing in Country: <u>Furnished</u>
   h. Transportation in Country: <u>Furnished</u>

   Per Diem: **$0**

# EXHIBIT

# 3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| TRACY K., and GALEN D. BARKER | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 1:07-CV-0294 |
| | § | |
| HALLIBURTON COMPANY d/b/a | § | |
| KBR KELLOGG BROWN & ROOT | § | |
| (KBR); KELLOGG BROWN & ROOT, | § | |
| SERVICES, INC.; KELLOGG | § | |
| BROWN & ROOT INTERNATIONAL, | § | |
| INC.; KELLOGG BROWN & ROOT, | § | |
| LLC; KELLOGG BROWN & ROOT, | § | |
| INC.; KELLOGG BROWN & ROOT, | § | |
| S. de R.L.; KELLOGG BROWN & | § | |
| ROOT (KBR), INC.; KBR | § | |
| TECHNICAL SERVICES, INC.; | § | |
| ALI MOKHTARE; SERVICE | § | |
| EMPLOYEES INTERNATIONAL, | § | |
| INC.; and THE UNITED STATES OF | § | |
| AMERICA | § | |
| | § | **JURY TRIAL DEMANDED** |
| Defendants. | § | |

## AFFIDAVIT OF JANET BROOKS

| | |
|---|---|
| STATE OF TEXAS | § |
| | |
| COUNTY OF HARRIS | § |

BEFORE ME, the undersigned authority, a Notary Public in and for the above county and state, on this day personally appeared Janet Brooks, known to me to be the person whose name is subscribed hereto, and having been first duly sworn, did depose and state:

My name is Janet Brooks. I am a Human Resources Supervisor with KBR Technical Services, Inc. ("KBRTSI"), a subsidiary of KBR, Inc. ("KBR"). I certify that I am competent to make this affidavit and have personal knowledge of the facts.

One of KBR's projects is called the Logistics Civil Augmentation Program, or "LOGCAP III." The LOGCAP III project provides logistical support to the U.S. government abroad, including operations in Iraq. Certain foreign subsidiaries of KBR, such as Service Employees International, Inc. ("SEII") employ persons to perform work on the LOGCAP III

project in performing under U.S. government contracts. In my capacity as Human Resources Supervisor, I oversee the recruiting and processing of these employees.

As the overseer of this process, I am familiar with the orientation and processing of individuals prior to their deployment for overseas assignment to the LOGCAP III project. All candidates for employment on the project must attend a week of orientation in Houston prior to their hiring. This orientation includes briefing on safety and security matters, harassment-free workplace policies, the KBR corporate anti-harassment policy, procedures for reporting any problem, a prohibition against retaliation, a description of KBR's open door policy and the announcement of a toll free number for its Employee Assistance Program. Recruits must complete this orientation prior to signing an employment agreement in Houston and being deployed overseas. Documents and presentations related to orientation (besides those individual copies kept by employees) are kept in Houston.

In my professional capacity, I also have access to and am familiar with the personnel records and employment histories of persons recruited for and hired by SEII, including Tracy Barker ("Barker"). Based upon review of those records, I know that Barker indicated when applying for overseas employment that she was residing at Fort Bragg, North Carolina. She was hired effective July 31, 2004 to work as an administrative assistant in Baghdad. She subsequently transferred to a different position in Basrah, Iraq.

Employment records for SEII employees such as Barker are maintained in Houston as well as Baghdad. Additionally, payroll records for those employees are maintained in Dubai.

The following documents included as exhibits to the Motion are true and accurate copies from KBR's records:

Tracy Barker Applicant Personal Information Supplement

Employment Agreement between Tracy K. Barker and SEII

Personnel Action Notice—Tracy Barker Hiring

Employee Transfer Form- Tracy Barker

Dated this __7__ day of __JUNE_____, 2007, at Houston, Texas.

_____

SUBSCRIBED AND SWORN TO BEFORE ME on June _07_, 2007, to certify which witness my hand and official seal.

_____
Notary Public in and for the
State of  T E X A S

CHERYL M. NETHERY
NOTARY PUBLIC
STATE OF TEXAS
COMM. EXPIRES 08-08-2009

Houston 3282286v.1

# EXHIBIT
# 4

**HALLIBURTON**

## PERSONNEL ACTION NOTICE

To ensure a timely and accurate process, please complete all required sections for the selected employee action, and route to appropriate transactional HR dept. for input

**PAN KEY**

| Action | Complete Sections: |
|---|---|
| ■ New Hires/Rehires | 1,2,4,5,6,7*,10,11,12,13 |
| ☐ Transfers ☐ Out ☐ In | 1,2,3,4,5,6,7*,10,12 |
| ☐ Title Change | 1,3,4,6,10,12 |
| ☐ Salary Change | 1,5,6,10,12 |
| ☐ Status Change/Leave | 1,6,7*,8,10,12 |
| ☐ Termination | 1,6,9,10,12,14,15 |
| ☐ Personal Change | 1,2,6,10 |
| ☐ Other* | |

*If applicable for Int'l assignment

**1** Effective Date (mm-dd-yy) **07-31-04**  SSN **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**  Government ID # ___  Personnel # ___  Applicant # ___  Birthdate (mm-dd-yy) **02-18-71**

Last Name **Barker**  First Name **Tracy**  Middle Name **Kristina**  Suffix ___  Common/Known Name ___

Business Phone ___  Business Fax ___  Employer **SEII - IRAQ**  Re-Hire (Prior Service?)  Co: ___  Dates: ___

**2 PERSONAL DATA/CHANGE**

Home Address: Street Number and Name (Apartment # if any) **160 Sisler St.**  Phone # **910-860-1077**

City **Fort Bragg**  State **NC**  Zip Code **28307**  Country **US**

Temporary or Medical Address: Street Number and Name (Apartment # if any)  Phone # ___

City ___  State ___  Zip Code ___  Country ___

Work Location /Contractor Address: Street Number,Name and Office # ___  Phone # ___

City ___  State ___  Zip Code ___  Country ___

Send Pay Check to: ☐ Home ☐ Temporary ☐ Work ■ Direct Deposit (form attached)

Emergency Contact: Name **Galen Dean Barker**  Relationship **Husband**  Phone: **910-860-1077**

**Local/Regional HR to complete**

EE Group __I__
EE Subgroup __06__
Personnel Admin. __HZ7__
Time Admin. __TXC__
Payroll Admin. __P20__
Payroll Area ___
Payment Model ___
Activity Type __GSEII__
Org. Date of Hire ___
Adj. Hire/RSP ___
Vacation Service ___
Union Service ___
Service Award ___
Home Tax Area ___
Host Tax Area ___
UI Tax – State ___
Distribution Method ___
Batch ID ___

**3 CURRENT TITLE/TRANSFER-OUT DATA**

Position Title ___

Position # ___  Job Code ___  Shift ☐ 1 ☐ 2 ☐ 3

Org. Unit ___  Supervisor ___

**4 PROPOSED TITLE/HIRE/TRANSFER-IN DATA**

Position Title **Administrative Associate**

Position # ___  Job Code **A401**  Shift ☐ 1 ☐ 2 ☐ 3

Org. Unit **43008016**  Supervisor **John Downey**

**5 SALARY DATA**

| Current Base/Currency | Type | Day Rate | Reason for Change | Amount Change | % Change | Pay Grade |
|---|---|---|---|---|---|---|
| | ☐ Hr. ☐ Mth. | | | | | |

| Proposed Base/Currency **$ 2,583.00** | Type ☐ Hr. ■ Mth. | Prior Increase: Date | Prior Increase: Reason | Prior Increase: Amount | Prior Increase: % Change | Prior Increase: Pay Grade |
|---|---|---|---|---|---|---|

**6 PROPOSED ACCOUNTING INFORMATION**

Home Cost Center **8432898005**  Company Code **3152**  Personnel Area **ZXDY**  Personnel Subarea **0005**

**7 FOREIGN SERVICE DATA** (attach Pay Calculation worksheet if applicable)

Input Personnel ___

☐ Expat (lives in host country)  ☐ Commuter  Home County: US
■ Regional Expat  ☐ Regional Commuter  Host Country: **IRAQ**
■ Short-term Project  ☐ Local

Date of Assignment to Current Location: **07-31-04**

Sender Cost Center **1200535116**

Check as Applies:  ☐ Housing Allowance $___  ☐ Company-Providing Housing
☐ Hypo Tax ☐ COLA  ☐ International Premium  ☐ Prevailing Wage Premium  ☐ # of Dependents
☐ Location ☐ Hardship  ☐ Local Pay/Currency $___  ☐ Other: ___

Entered by: ___  Date: ___
Audited by: ___  Date: ___

**8 STATUS CHANGE/LEAVE** (Doctor's Note Required for Leave and Return)

Reason Code ___

LOA – Begin Date ___  ☐ Projected ☐ Actual  Return Date: ___

**14 TERMINATION**

Reason Code ___

| Last Date Worked | Remaining Vacation | Remaining Flex | Severance Days | In Lieu of Notice Days |
|---|---|---|---|---|

List Company Property Returned: ___

**9 DISCLOSURE DATA: (Where required)**

Gender  ☐ Male ■ Female

Marital Status: ☐ M ☐ Divorced
☐ S ☐ Widowed

Birth Place: __MO__
Citizenship: USA
Language: __English__
Denomination: (Int'l Only) ___

ETHNIC CODES
☐ 1 White
☐ 2 Black
☐ 3 Hispanic
☐ 4 Asian/Pacific Islander
☐ 5 American Indian/Alaska Native
☐ 6 Other (Int'l Only)

VETERAN STATUS (U.S Only)
☐ Non-Veteran
☐ Disabled Veteran
☐ Vietnam Era Veteran
☐ Disabled Vietnam Era Veteran
☐ Other Veteran

**10 COMMENTS** (Provide Explanation for Personnel Action)

___

**11 APPROVALS**

Initiator or Supervisor Signature  Date (mm-dd-yy) **08-02-04**  Human Resources  Date (mm-dd-yy) ___

Manager Signature  Print Manager's Name **Louis Rigby**  Date (mm-dd-yy) ___

Officer Signature  Print Officer's Name ___  Date (mm-dd-yy) ___

Reverse side **must** be completed for all New Hire / Rehire and Separation events

# EXHIBIT

# 5

## HALLIBURTON COMPANIES
### APPLICANT PERSONAL INFORMATION SUPPLEMENT

| ARRIVAL DATE |
| --- |
| 07/11/04 |

**( PLEASE PRINT OR TYPE INFORMATION LEGIBLY AND USE BLACK INK ONLY)**
**FILL OUT COMPLETELY. ANY OMMISIONS OF INFORMATION COULD CAUSE THIS DOCUMENT TO BE**
**RETURNED OR EMPLOYMENT DENIED.**

Full Name

| Barker | | Tracy | Kristina |
| --- | --- | --- | --- |
| Last | Suffix (Jr, Sr, etc.) | First | Middle |

Social Security Number: 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   Date of Birth: 02/18/1971

Home Phone: (910)860-1077  Alternate Phone: (910)797-4167

**Residence Address**: For the last _seven_ years, begin with current address **( LIST U.S. ADDRESS ONLY )**
**(If PO Box, add physical street address and if there are not enough lines, continue on supplement page)**

| From – To | Street Address | City, State | Zip | County |
| --- | --- | --- | --- | --- |
| 07-03 Present | 160 Sisler | FT. Bragg NC | 28307 | US |
| 05-02 07-03 | 8509 Amish Drive | Fayetteville NC | 28314 | US |
| 05-01-05-02 | 425 West 1575 South #D | Sunset Utah | 84403 | US |
| 05-00-05-01 | 286 East 4475 South | Ogden Utah | 84403 | US |
| 05-98-05-00 | 2727 South 625 West | Bountiful Utah | 84010 | US |
| 97-98 | 4201 Deer Run Dr | S. Ogden Ut | 84403 US | |

**Employment:** For the last _seven_ years, begin with current employer **(If there are not enough lines, continue on supplement page)**

| From/To | Employer | City | County | State | Zip |
| --- | --- | --- | --- | --- | --- |
| 05 03/06 04 | Footlocker | Fayetteville | Cumberland | NC | 28314 |
| 10 03/05 04 | Chili's | Fayetteville | Cumberland | NC | 28314 |
| 02 03/10 03 | Home w/baby | Fayertteville | Cumberland | NC | 28314 |
| 11 02/02 03 | Interim Health | Fayetteville | Cumberland | NC | 28314 |
| 05 02/11 02 | Dr.Noonan | Fayetteville | Cumberland | NC | 28314 |
| 03 02/05 02 | In-transit to NC | Fayetteville | Cumberland | NC | 28314 |
| 10 01/03 02 | Bountiful | Bountiful | Davis | UT | 84010 |
| 10 00/10 01 | Chili's | South Jordan | Davis | UT | 84015 |
| 01 99/10 00 | Student | Ogden | Weber | UT | 84403 |
| 1989-1999 | Internal revenue Service | Ogden | Weber | UT | 84403 |

X **I HAVE NOT** been convicted of a felony, a misdemeanor or imprisoned in the past _seven_ years, nor is an indictment or criminal charges currently pending against me.

_____ **I HAVE** been convicted of a felony, a misdemeanor or imprisoned in the past _seven_ years, or there is an indictment or criminal charges currently pending against me.

(If you placed a check on the "I HAVE" line, give explanation below; include a description of the violation, month and year and city and state the violation took place. **Also list all traffic violations.** If there are not enough lines, continue on supplement page.) – **PLEASE CHECK ONLY ONE.**

_____

_____

_____

# EXHIBIT
# 6

KELLOGG BROWN & ROOT
LOGCAP III
**JOB RECORDS CHANGE FORM**

## KBR

### Employee Transfer Form

| Date of Hire (As per contract) | Date of Arrival | Employee ID | Last Name | First |
|---|---|---|---|---|
| | 11/27/2004 | 316715 | Barker | Tracy |

| **Change From** | | **Change To** | |
|---|---|---|---|
| Job Classification: | Billeting Coordinator | Job Classification: | Billeting Coordinator |
| Department: | Billeting | New Department: | Billeting |
| Section: | Logistics | New Section: | Logistics |
| Manager/Supervisor: | Johnnie Harris | New Manager/Supervisor: | |
| Work Location: | USM-I Central | New Work Location: | USM-I South |
| Sleeping Location: | Baghdad, Iraq | New Sleeping Location: | Basrah, Iraq |
| | | Effective Date: | 3/13/2005  Must be following Sunday |

| **For Project Controls only** | | **For Project Controls only** | |
|---|---|---|---|
| Control Code: | | New Control Code: | GC02H8-ASA060X02-5 |

THIS FORM IS TO BE FILLED OUT AND TURNED INTO HR PRIOR TO AN EXPAT/TCN EMPLOYEE

TRANSFERRING FROM ONE SECTION TO ANOTHER REQUIRING A CHANGE IN WBS CODE.

THIS FORM IS NOT TO BE USED FOR RECLASSIFICATIONS/BASE PAY CHANGE.

PLEASE CONTACT HR ON ALL RECLASSIFICATIONS/BASE PAY CHANGES.

COMMENTS:

(Attach additional comments if necessary)

| | | | |
|---|---|---|---|
| Releasing Supervisor | _[signature]_ | Receiving Supervisor | |
| Releasing Manager | _[signature]_ | Receiving Manager | |
| Releasing PM | _[signature]_ | Receiving PM | _[signature]_ |
| Controls Signature: | _[signature]_ | HR Approval: | |

**KELLOGG BROWN & ROOT PROPRIETARY DATA - COMPANY CONFIDENTIAL INFORMATION**
NOTE: This document contains information which may be withheld from the public because disclosure would cause a foreseeable harm to an interest protected by one or more Exemptions of the Freedom of Information Act, 5 USC Section 552. Furthermore, it is requested that any Government entity receiving this information act in accordance with DoD 5400.7-R, and consider this information as being 'for official use only (FOUO), and mark, handle and store this information so as to prevent unauthorized access.

Rev. 6/15/03

# EXHIBIT

# 7

# THE KELLY LAW FIRM, P.C.

*Attorneys – Counselors – Trial Lawyers*
One Riverway Drive, Suite 1150
Houston, Texas 77056-1920
(713) 255-2055
(713) 523-5939 (fax)

Writer's e-mail:            Or visit on the Web at:
*todd@kellylawfirm.org*       *www.kellylawfirm.org*

L. Todd Kelly, Esq*                                           March 7, 2007

Shadow Sloan, Esq.
Vinson & Elkins LLP
First City Tower
1001 Fannin Street, Suite 2300
Houston, Texas 77002-6760

      Regarding:   *Barker v. Halliburton, et al.*

Dear Ms. Sloan:

    As we discussed last week, I have very recently been retained to assist Tracy Barker in her claim against Halliburton for the sexual harassment, hostile work environment, premises liability and assault that she experienced while employed with Service Employees International, Inc., in the Green Zone in Iraq.

    A review of this file makes it clear that a number of depositions need to be taken of Halliburton employees. Please advise when the following depositions can be taken (If any of these individuals are no longer employed by Halliburton, please provide their last known addresses for the service of a *subpoena* to appear):

| | | | |
|---|---|---|---|
| Crystal Daniels; | Barron Marcee; | Crystal Martinez; | Kara Hall; |
| Wesley Lane; | Tony Vincent; | Steve Osgood; | Terrance Copeland; |
| Edward Powell; | Steve Gulyas; | Trea Miller; | Sherman Richardson; |
| Craig Grabein (sp?); | Kenya Thomas; | Robert Richmond; | Arnold Palmer; |
| Holly Sacco; | Barbara Abbott; | Bill Lloyd; | Tony Dimovski; |
| David Ziemba; | Nicholas Aguilard; | Jerry McElveen; | Ali Mokhtare; |

    Additionally, the following persons may also need to be deposed at some point prior to the arbitration of this matter. Please confirm whether each is a current employee of Halliburton, or provide the last known address for the purpose of serving a subpoena:

| | | | |
|---|---|---|---|
| Christella Lopez; | Tony Vinson; | Bob Swisher; | _____ Hutchins; |
| John Stuart; | Cynthia Frank; | Rosita McKenzie; | Doug Bellah; |
| David O'Keefe; | Jennifer Valex/z; | Darrell Kaiger; | Sibby _____; |
| Brian Hathaway; | Clarence Noble; | Jeff Melton; | August Finn; |
| Lyn Falanga; | Adam Gabriel; | Duane Kizer; | |

THE KELLY LAW FIRM, P.C.
3/6/2007

*Licensed in Texas, Virginia & Pennsylvania*

# THE KELLY LAW FIRM, P.C.

Shadow Sloan
*Barker v. Halliburton, et al.*
Page 2

I would also like to discuss the issue of the arbitrator, and whether we can agree to select a mutually agreeable arbiter of this dispute. Because the arbitrator will be the sole decider of fact in this case, I do not want to begin this process with someone who even appears to approach this case with my client on less than an even "playing field." I am sure that you would feel the same way with an arbitrator who spent his/her entire career representing employees, and obviously continued to do so at the time of the arbitration. Nor would I insist that you do so. While I have no personal experience with Jeff Londa, his personal page on his firm's web site certainly would appear to support a big-business bias, and his reputation among the attorneys with whom I have consulted appears to support that presentation. I think that we both agree that we would rather have this case heard by an unbiased trier of fact.

If we cannot agree, please advise, as I believe that there is a legitimate issue surrounding whether the arbitration clause is applicable to and enforceable against this employee of SEII (as opposed to Halliburton), and whether all claims need to be brought at the same time. Having now more fully reviewed these facts, it would appear that the sexual assault, premises liability, and false imprisonment claims would fall outside the purview of the arbitration agreement.

Sincerely,

THE KELLY LAW FIRM, P.C.

L. Todd Kelly

cc:    Stephanie Morris
       Tracy Barker

# EXHIBIT

# 8

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| TRACY K., and GALEN D. BARKER | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 1:07-CV-0294 |
| | § | |
| HALLIBURTON COMPANY d/b/a | § | |
| KBR KELLOGG BROWN & ROOT | § | |
| (KBR); KELLOGG BROWN & ROOT, | § | |
| SERVICES, INC.; KELLOGG | § | |
| BROWN & ROOT INTERNATIONAL, | § | |
| INC.; KELLOGG BROWN & ROOT, | § | |
| LLC; KELLOGG BROWN & ROOT, | § | |
| INC.; KELLOGG BROWN & ROOT, | § | |
| S. de R.L.; KELLOGG BROWN & | § | |
| ROOT (KBR), INC.; KBR | § | |
| TECHNICAL SERVICES, INC.; | § | |
| ALL MOKHTARE; SERVICE | § | |
| EMPLOYEES INTERNATIONAL, | § | |
| INC.; and THE UNITED STATES OF | § | |
| AMERICA | § | |
| | § | |
| Defendants. | § | |

## AFFIDAVIT

1.      I, Shadow Sloan, am of sound mind and over the age of twenty-one.  I am competent to make this Declaration, and I have personal knowledge of the truth of its contents.

2.      I am a partner at the Vinson & Elkins law firm.  I was retained to defend KBR in the arbitration Tracy Barker initiated based upon the same allegations that the Barkers make in this lawsuit.

3.      I conducted an investigation of Ms. Barker's claims after she initiated arbitration.

4.      On March 7, 2007, I received a letter from Ms. Barker's lawyer listing 41 individuals he either hoped to depose or thought he might need to depose on her behalf.  A true and accurate copy of this letter is attached as an Exhibit 7 to this Motion.

5.      Below, I identify persons on this list whose testimony would likely be of significance in this lawsuit:

a)  Crystal Daniels was Ms. Barker's supervisor when Ms. Barker worked in the Procurement Department in Baghdad.  Her testimony regarding Ms. Barker's working conditions, job performance, and behavior is likely sought.

b)  Barron Marcee was Ms. Barker's manager when Ms. Barker worked in the Procurement Department in Baghdad.  His testimony regarding Ms. Barker's working conditions, job performance, and behavior is likely sought.

c)  Kara Hall was an on-site human resources representative when Ms. Barker worked in the Procurement Department in Baghdad.  His testimony regarding Ms. Barker's complaints while working in the Procurement Department in Baghdad is likely sought.

d)  Wesley Lane was a human resources representative when Ms. Barker worked in the Procurement Department in Baghdad.  Her testimony regarding mediation of difficulties between Ms. Daniels and Ms. Barker and Ms. Barker's administrative leave is likely sought.

e)  Terrence Copling was a human resources representative when Ms. Barker worked in the Procurement Department in Baghdad.  His testimony regarding KBR's investigation into a complaint made by Ms. Barker likely is sought.

f)  Robert Richmond was Ms. Barker's supervisor when Ms. Barker was transferred to Basrah, Iraq. Ms. Barker's Complaint alleges that her direct supervisor engaged in quid pro quo sexual harassment of her, and his testimony likely is sought on this topic.

g)  Craig Grabein was Ms. Barker's project manager when she was transferred to Basrah, Iraq. Ms. Barker's Complaint alleges that her direct supervisor engaged in quid pro quo sexual harassment of her, and his testimony likely is sought on this topic. Ms. Barker's Complaint also alleges that the working environment there was sexually hostile and that management openly displayed pornography, and his testimony likely is sought on this topic as well. Mr. Grabein's testimony likely also is sought regarding the alleged attack on Ms. Barker by the State Department employee.

h)  Trae Miller was a human resources representative in Kuwait contacted by Ms. Barker.  Mr. Miller likely can testify about Ms. Barker's communications with him and his efforts to meet with her.

i)  Jeff Melton is a project manager in Basrah.

6.    Other persons on the list include:

a)  Criselita Lopez, who was Ms. Barker's co-worker in the Procurement Department in Baghdad.

b)  Tony Vinson, who was the project manager and supervisor of Barron

2

Marcee in Baghdad.

c)    Sherman Richardson, who was Ms. Barker's co-worker in Basrah, Iraq.

d)    Toni Dimkovski, who worked in the security department in Basrah, Iraq.

e)    Jerry McElveen, who was a medic in Basrah, Iraq.

f)    Clarence Noble, who was Ms. Barker's co-worker in Basrah, Iraq.

g)    Barbara Abbot, who was Ms. Barker's roommate.

h)    Nicholas Aguilard, who was a procurement manager.

i)    David Ziemba, who was a procurement manager.

j)    Brian Hathaway, who was a State Department employee.

Dated this 7TH day of ____JUNE_____, 2007, at Houston, Texas.

SUBSCRIBED AND SWORN TO BEFORE ME on June ____, 2007, to certify which witness my hand and official seal.

PEGGY S. PENDLETON
NOTARY PUBLIC
STATE OF TEXAS
COMM. EXPIRES 04-20-2009

Notary Public in and for the
State of  T E X A S

3